# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan Humphrey Lefkow | Sitting Judge if Other than Assigned Judge | Ian H. Levin |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7505 | **DATE** | 10/4/2001 |
| **CASE TITLE** | Barnes vs. Apfel | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ **[Other docket entry]** **Enter report and recommendation recommending that plaintiff's motion for summary judgment be granted insofar as it request a remand to the Commissioner for further proceedings consistent with the report. It is further recommended that the defendant's cross motion for summary judgment be denied is hereby submitted to the Judge Lefkow. All matters relating to the referral of this action having been resolved, the case is returned to the assigned judge.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | 2 number of notices | Document Number |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | OCT 09 2001 date docketed | |
| | Docketing to mail notices. | | 23 |
| | Mail AO 450 form. | docketing deputy initials | |
| ✓ | Copy to judge/magistrate judge. | | |
| | | 10/4/2001 date mailed notice | |
| SM courtroom deputy's initials | | 01 OCT -5 PM 3:07 | |
| | | Date/time received in central Clerk's Office | SM mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHELLE BARNES, on behalf of )
ALEXIS AND ALEXANDRIA BARNES, )
)
Plaintiffs, )
)
v. ) Case No. 00 C 7505
)
LARRY G. MASSANARI, ) Judge Joan Lefkow
Acting Commissioner of the Social Security ) Magistrate Judge Ian H. Levin
Administration, )
)
Defendant. )

DOCKETED
OCT 0 9 2001

To: The Honorable Joan H. Lefkow
United States District Court Judge

## REPORT AND RECOMMENDATION

Plaintiff Michelle Barnes ("Plaintiff") brings this action for judicial review of the final decision of the Commissioner (the "Commissioner") of the Social Security Administration (the "SSA") denying her children, Alexis and Alexandria Barnes, survivor benefits pursuant to 42 U.S.C. § 402(d). Before the court are the parties cross-motions for summary judgement. For the reasons set forth below, the court recommends that the cause be remanded for proceedings consistent with this opinion.

## PROCEDURAL HISTORY

On July 28, 1991, Plaintiff filed applications for survivors insurance benefits on behalf of her minor children, Alexis and Alexandria Barnes.[1] (R. 42-44, 453.) The SSA denied the applications because Plaintiff was unable to prove that the relevant wage earner, Ronald Lewis ("Lewis"), was

---

[1] References are to the certified administrative record prepared by the Commissioner and filed with this court pursuant to 42 U.S.C. § 405(g).

the father of Alexis and Alexandria Barnes. (R. 454.) Plaintiff did not appeal her claims. (R. 15.)

On December 8, 1994, Plaintiff filed a second set of applications seeking survivors benefits on behalf of her children. (R. 46-48.) The SSA denied the claims by a notice of initial determination dated January 27, 1995. (R. 15.) Plaintiff, subsequently, filed a request for hearing. (R. 15.) On October 18, 1996, Administrative Law Judge ("ALJ") Allyn Brooks dismissed the request for a hearing as being premature, and remanded the claims to the SSA for reconsideration determinations. (R. 15.) The SSA denied the claims by notice of reconsideration dated November 28, 1996. (R. 15.)

Plaintiff timely filed a request for hearing on December 6, 1996. (R. 15.) On January 29, 1999, after holding a hearing on June 19, 1998, ALJ Steven H. Templin denied Plaintiff's claim for survivors' benefits. (R. 15-37.) On September 28, 2000, the Appeals Council denied review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 3-4.)

## BACKGROUND FACTS

### I. HEARING TESTIMONY

#### A. TESTIMONY OF PLAINTIFF

Plaintiff met Lewis in September, 1986 at a grocery store, and they started dating. (R. 381.) At the time, Plaintiff was eighteen years old and in high school, while Lewis was twenty years old and in college. (R. 381.) They were both living in Prescott, Arizona. (R. 382.) Plaintiff lived with her father; Lester Barnes, her stepmother; Reevonne Mobley-Barnes, her daughter; Tiffany, and her two sisters. (R. 382.) Lewis lived in a trailer with two roommates. (R. 382.)

In March, 1987, Lewis moved out of the trailer and into Woodland Apartments. (R. 65, 382.) As part of the lease application, Lewis completed an "application for residency" and Plaintiff filled

out a second page, listing "Michelle Lewis" and "Tiffany Lewis" as additional occupants. (R. 66, 383.) Plaintiff testified that she listed her last name as Lewis because they did not want the apartment complex to think that they were living together and not married. (R. 383.)[2] Plaintiff and Tiffany moved into the apartment in March, 1987. (R. 383.)

Plaintiff testified that she and Lewis began having sexual relations when they moved into the apartment. (R. 385.) From March, 1987 until the time that Plaintiff found out she was pregnant, she testified that she did not have sexual relations with anyone other than Lewis. (R. 386.) Plaintiff stated that she had sexual relations with Lewis in June and July of 1987, and there was no doubt in her mind that Lewis was the father of the two girls. (R. 387.)[3] Plaintiff testified that Lewis was happy when he found out about the pregnancy because he wanted a child. (R. 387.)

About one month after she found out that she was pregnant, Plaintiff told her father, Lester Barnes. (R. 387.) Plaintiff reported that her father was not happy because her daughter, Tiffany, was only eight months old at the time. (R. 387.) Plaintiff testified that her father called Lewis's parents and told them about the pregnancy. (R. 387.) Plaintiff and Ronald Lewis were both present when Mr. Barnes's made the call. (R. 387.) Plaintiff testified that Mrs. Lewis told her father that they would stop paying for Lewis's education and apartment unless Plaintiff moved back to her father's house (R. 387.) Plaintiff, subsequently, moved back to her father's house; however, she continued seeing Lewis. (R. 391.)

---

[2] The transcript reads, "And the reason why Lewis is on here is because he wanted the apartment complex to think that we were living together and not married." (R. 383.) The parties agree that what Plaintiff meant was the Lewis did not want the complex management to think that they were living together and not married. Pl.'s Mem. at 3; Def.'s Mem. at 2.

[3] On March 17, 1988, Plaintiff gave birth to twin girls. (R. 69-70.)

3

In October, 1987, Plaintiff and Tiffany moved to South Carolina to live with her mother. (R. 391.) After Plaintiff had moved, she stayed in contact with Ronald Lewis by telephone. (R. 391.) On March 17, 1988, as stated, Plaintiff gave birth to twin girls (R. 69-70). Plaintiff contacted Lewis and found out that he was living in Chicago at his parents' house. Plaintiff sent pictures of the twins to Lewis; however, he never wrote back. (R. 391.) After sending the pictures, Plaintiff was not able to speak to Lewis. (R. 392.) Plaintiff tried to contact Lewis, but Mrs. Lewis would tell her that Lewis was not at home, so she stopped calling. (R. 392.) Plaintiff stated that she spoke with Mrs. Lewis three or four times after the twins were born. (R. 392.)

Plaintiff applied for public welfare benefits in South Carolina and listed Lewis as the father of her twin daughters on the application for benefits. (R. 392-93.) Plaintiff testified that she could not list Lewis as the father on the children's birth certificates because South Carolina law requires that Lewis sign paperwork indicating that he is the father.[4] Plaintiff was never contacted about her application for benefits in South Carolina, and she never filed a lawsuit against Lewis in South Carolina to establish paternity. (R. 393.)

In July 1989, Plaintiff moved back to Arizona to live with her father. (R. 393.) Plaintiff, again, applied for welfare benefits for her children. (R. 67, 395.) Plaintiff listed Lewis as the children's father on the absent parent form. (R. 67-68, 396.) In applying for public benefits, Plaintiff knew that Lewis would be contacted to establish that he was the father of the twins. (R. 396.) Plaintiff, thus, agreed to cooperate with the county attorney's office and appear as a witness at hearings to testify that Lewis was the father of her twin daughters. (R. 396.) Moreover, Plaintiff was

---

[4]This was supported by a letter from Harrison Rearden, Ombudsman from the South Carolina Department of Social Services. (R. 186.)

4

aware of the potential five year prison term and fine for providing false information regarding this matter. (R. 397.)

In August and September of 1989, Plaintiff attempted to contact Lewis by placing collect phone calls to his parents' house. (R. 394.) Plaintiff testified that she spoke to Lewis, but he did not express any interest in seeing the children. (R. 394.)

On March 16, 1991, Plaintiff called Lewis at his parents' house. (R. 395.) Mrs. Lewis told Plaintiff that Lewis had died in a car accident. (R. 395.) Four months later, Plaintiff applied for survivors' benefits. (R. 397.)

Plaintiff also testified with respect to her father's phone bills. (R. 399.) From the telephone records, Plaintiff recognized three of the telephone numbers as being calls that were placed to the Lewis's residence in Chicago, Illinois in July, 1987. (R. 399.) Plaintiff testified that if copies of the Lewis's phone records were obtained for the same time period, they would show that calls had been made from the Lewis's residence to the Barnes's residence. (R. 400.) In addition, Plaintiff stated that the Lewis's phone records would show phone calls, possibly collect calls, made to the Barnes's residence in July, August, and September, 1989. (R. 300.)

The ALJ inquired about the three one minute phone calls to Lewis's residence in July, 1987 and asked Plaintiff whether these reflected the phone conversations about her pregnancy and that Plaintiff was expected to return to her father's residence. (R. 401.) In response to the ALJ's inquiries, Plaintiff testified that the call was placed to the Lewis's in 1987, and she recalled that the Lewis's ended up calling them back because one of his parents was not at home, and that is when the lengthy conversation occurred. (R. 401.)

### B. TESTIMONY OF LESTER BARNES

Mr. Barnes testified that he first met Ronald Lewis when he came home from work one evening and Lewis was at his house with Plaintiff. (R. 442.) Mr. Barnes testified that after Plaintiff and Lewis had been dating, Plaintiff moved in with Lewis. (R. 443.) After Plaintiff had moved out, she brought Lewis to Mr. Barnes's house on several occasions. (R. 444.)

One day when Mr. Barnes was at work, his wife, Mrs. Mobley-Barnes, met him for lunch and told him that when he got off work that evening, Plaintiff and Lewis had something to discuss with him. (R. 444, 495.) Mr. Barnes testified that when he got home from work that day, Plaintiff, in Ronald Lewis's presence, told him that she was pregnant and that Lewis was the father. (R. 445.) Moreover, Plaintiff told her father that the pregnancy had been planned; thus, she and Lewis had agreed upon the pregnancy. (R. 445.) Mr. Barnes testified that he upset by the news because Plaintiff had an eight month old child and he had wanted Plaintiff to go to school and get an education. (R. 445.) Mr. Barnes spoke with Lewis, who was also at the Barnes' residence with Plaintiff, and then called Lewis's parents. (R. 446-47.)

Mr. Barnes testified that he placed a call to Lewis's father and had a lengthy conversation with him that same night. (R. 447.) Mr. Barnes, however, also indicated that it was possible that someone may have called him back after he placed the initial phone call. (R. 447.) Mr. Barnes told Lewis's father that Plaintiff and Lewis had been living together for the past few months, that they had decided to have a child and that Plaintiff was pregnant. (R. 448.) Mr. Barnes testified that at some point in the conversation Ron Lewis spoke to his father on the telephone and told him that he had been living with Plaintiff, she was pregnant, and he was the father. (R. 448.) Mr. Barnes testified that there was no doubt in his mind that Ronald Lewis had acknowledged to him that had impregnated Plaintiff. (R. 449.) Shortly, thereafter, Plaintiff moved back to her father's house. (R.

6

449.) Plaintiff, subsequently, moved to South Carolina to live with her mother. (R. 449.)

## C. TESTIMONY OF WILLIAM LEWIS.

William Lewis, Ron Lewis's father, testified that his son-in-law went to Prescott, Arizona to see Ron Lewis. (R. 404-05.) William Lewis's son-in-law told him that Ron Lewis had helped a young lady move, and the lady's father had "jumped all over Ron" which is the reason William Lewis called Mr. Barnes. (R. 405.) William Lewis testified that he called the Barnes's residence, and spoke to Plaintiff's stepmother, Mrs. Mobley-Barnes, while waiting to speak to Mr. Barnes. (R. 405.) Mrs. Mobley-Barnes told Mr. Lewis that her husband had kicked Plaintiff out of the house. (R. 405.) When Mr. Lewis told Mr. Barnes that his son, Ron Lewis, was in Arizona to go to school, and not help him raise a daughter, Mr. Barnes hung up on him. (R. 406.) Mr. Lewis testified that this was the only conversation he had with Mr. Barnes. (R. 406.) Mr. Lewis also testified that when he asked Ron Lewis whether Plaintiff was living with him, Lewis stated that she was not. (R. 409.)

Mr. Lewis testified that when Lewis first moved to Arizona in 1985, he lived in a dorm. (R. 406.) From 1986 to 1987, Lewis lived in part of a house (kitchenette). (R. 406). After that, Lewis moved into a trailer with two other "fellows." (R. 406.) Mr. Lewis further testified that Lewis never lived in an apartment in Arizona. (R. 411.) When Lewis got out of school, he moved back to Chicago where he stayed with his parents for about two weeks, and then moved into his own apartment. (R. 407.)

Mr. Lewis testified that Lewis never mentioned that he was having an intimate relationship with Plaintiff and that he had fathered two children. (R. 409.) Mr. Lewis stated that their family was very close knit and that none of Lewis's three siblings knew anything about Lewis's alleged relationship with Plaintiff. (R. 409.) Moreover, Mr. Lewis testified that Lewis did not lie, and that

7

he never caught Lewis telling a lie. (R. 422.)

### D. TESTIMONY OF ANNE LEWIS

Anne Lewis, Ronald Lewis's mother, testified that the only telephone conversations she had with Plaintiff were after Lewis's death. (R. 425.) These conversations dealt with Plaintiff's allegations that Lewis was the father of her two children. (R. 425.) Mrs. Lewis testified that she had never spoken with Mr. Barnes or placed a telephone call to his house or Plaintiff's house. (R. 427.) Furthermore, Mrs. Lewis testified that she never accepted collect phone calls from Plaintiff; however, she could not speak for the other members of her household. (R. 435.)

Mrs. Lewis further testified that Lewis never moved out of the trailer home he lived in until the school year was over. (R. 432.) In addition, Lewis never indicated that he was the father of Plaintiff's children. (R. 426.) Furthermore, when asked about the circumstances surrounding Lewis's death, the ALJ instructed Mrs. Lewis not to answer and asked Plaintiff's counsel if he had any relevant questions. (R. 438.)

## II. OTHER EVIDENCE

### A. AFFIDAVIT OF ROBIN MENDENHALL

In her affidavit, Ms. Mendenhall (Plaintiff's friend) stated that she had known Plaintiff for many years and saw Plaintiff occasionally in 1986, and throughout the summer of 1987. (R. 81.) Ms. Mendenhall stated that, during the summer of 1987, she went to Plaintiff and Lewis's apartment where Plaintiff told her that she was pregnant. (R. 81.) Ms. Mendenhall stated that Lewis appeared very enthusiastic about his future relationship with Plaintiff and their baby. (R. 81.)

### B. STATEMENT OF REEVONNE MOBLEY-BARNES

Mrs. Mobley-Barnes, Plaintiff's stepmother, wrote a letter dated September 23, 1991, stating

that in 1986, Ronald Lewis helped Plaintiff move out of her father's house and into his apartment. (R. 75.) Several months after Plaintiff had moved in with Lewis, his parents called the Barnes's residence and stated that they were very upset over the fact that Plaintiff was living with Lewis. (R. 75.) Mrs. Lewis indicated that they told Lewis that they would continue to support him only if Plaintiff immediately moved back to her father's house. (R. 75.) Lewis, subsequently, returned Plaintiff to her father's house. (R. 75.) Plaintiff and Lewis continued to talk on the telephone and see each other after Plaintiff had returned to her father's house. (R. 76.) Plaintiff also announced that she and Lewis had decided to have a baby. (R. 76.)

Mrs. Mobley-Barnes also stated that after Plaintiff had moved to South Carolina, she called her father and stepmother on several occasions and told them that she had spoken with Lewis. (R. 76.) In addition, after Plaintiff moved back to Arizona, she continued to contact Lewis by making collect calls to him. (R. 76.)

### III. THE ALJ'S FINDINGS AND DECISION HEREIN.

On January 29, 1999, the ALJ issued a decision denying Alexis and Alexandria Barnes' claims for survivor benefits. (R. 12-37.) In issuing his decision, the ALJ found that Lewis was never married, and that Plaintiff and Lewis never went through a marriage ceremony that would have resulted in a valid marriage. (R. 36.) The ALJ determined that Lewis never acknowledged in writing that Alexis and Alexandria Barnes were his children, was never decreed by a court to be the children's father, and was never ordered by a court to contribute to the children's support. (R. 36.) Moreover, Lewis was not living with, or contributing to the support of Alexis and Alexandria Barnes at the time of his death. (R. 37.)

The ALJ considered the testimony of Plaintiff as well as the evidentiary records submitted

9

on her behalf. (R. 23-26.) The ALJ found that Plaintiff consistently reported to third parties, including governmental officials, that Lewis was the natural father of Alexis and Alexandria Barnes. (R. 32.) The ALJ stated that "[t]here is no basis in this record for concluding that her belief is insincere." (R. 32.) In addition, "[t]here is no direct evidence of record to rebut Ms. Barnes's assertion that she and the wage earner had sexual relations, or her assertion that she did not have sexual relations with other men proximate to the time she became pregnant." (R. 32-33.) Plaintiff could have become pregnant, in June, 1987, while living with Lewis. (R. 33.) Thus, based on the record, the ALJ found that it is possible that Lewis was the natural father of Alexis and Alexandria Barnes. (R. 33.)

The ALJ also found that there were "multiple inconsistencies" with respect to the facts and circumstances presented at the hearing. (R. 34.) For example, in a Child Relationship Statement submitted by Plaintiff to the Social Security Administration on July 30, 1991, she stated that Lewis, to her knowledge, had never acknowledged the children orally to anyone. (R. 34.) The ALJ found that this statement directly contradicted Plaintiff's as well as Mr. Barnes's hearing testimony. (R. 34.) In addition, the ALJ found that Plaintiff's statement supported the testimony of Lewis's parents denying that Lewis ever made an acknowledgment that he was the father of Alexis and Alexandria Barnes. (R. 35.)

In addition, the ALJ considered Ms. Mendenhall and Mrs. Mobley-Barnes affidavits. (R. 36.) The ALJ found the vague and inconsistent statements of Ms. Mendenhall's affidavit to be unconvincing. (R. 36.) The ALJ, on the other hand, found that although there were inconsistencies between Mrs. Mobley-Barnes's affidavit and other statements and testimony of record, the overall tone and import of her affidavit was consistent with Mr. Barnes's testimony that his ex-wife and

10

Plaintiff were on good terms. (R. 34.) The significance of that relationship was relevant to Mr. Lewis's testimony concerning information he obtained from Mrs. Mobley-Barnes when he had spoken to her. (R. 34.)

The ALJ considered the telephone billing records submitted by Mr. Barnes. (R. 35.) The ALJ found that the billing information did not substantiate that Mr. Barnes placed a single, lengthy telephone call to Mr. Lewis. (R. 35.) The billing information reflected three one-minute telephone calls in July, 1987, which did not corroborate the extensive conversation reported by Plaintiff and her father. (R. 26.) In addition, two of the three, one-minute calls telephone calls to Mr. Lewis's home telephone number took place on a Saturday, not Monday through Friday, when Mr. Barnes testified that he worked. (R. 35.) While the third call took place on a weekday and was not inconsistent with the events described by Mr. Barnes, the ALJ found that he was more convinced by the direct, clear, and responsive testimony of Mr. and Mrs. Lewis concerning their contacts with the Barnes's family. (R. 35-36.) The ALJ, thus, concluded that Lewis did not make an oral acknowledgment of paternity to his parents during a telephone conversation. (R. 36.)

Therefore, the ALJ concluded that the record failed to establish by clear and convincing evidence that Lewis was the father of Alexis and Alexandria Barnes. (R. 15-37.)

## **LEGAL STANDARD**

The ALJ's findings of fact must be upheld if supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Pearles*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). A federal court may not reevaluate the facts, reweigh the evidence, or substitute its own judgment for that of the

Commissioner. *Brewer*, 103 F.3d at 1390. Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). Conclusions of law are not entitled to deference; however, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## ANALYSIS

Plaintiff's threshold argument is that the ALJ's January 29, 1999 decision that Plaintiff's children, Alexis and Alexandria Barnes, are not the natural children of Lewis is not supported by "substantial evidence." Accordingly, Plaintiff seeks a reversal of the ALJ's decision and a remand for an award of survivor benefits.

Upon review of the record, the court finds that there exists substantial evidence to support the ALJ's decision, and it is, therefore, recommended that Plaintiff's request for an outright reversal be denied.

Alternatively, Plaintiff requests that the court remand the cause for further proceedings consistent with Plaintiff's arguments set forth herein. Specifically, as it relates to remand, Plaintiff alleges, *inter alia*, that the ALJ erred by (1) failing to make an explicit credibility determination regarding Plaintiff's testimony, (2) finding no legitimate basis upon which to subpoena the Lewis's telephone records, (3) rejecting the affidavit of Ms. Mendenhall based upon perceived "inconsistencies" in the affidavit, and (4) refusing to allow Plaintiff's counsel to examine Mrs. Lewis

at the hearing regarding the death of her son. *See generally*, Pl.'s Briefs.[5]

## I. CREDIBILITY DETERMINATION

Plaintiff initially argues that the ALJ improperly failed to make an "explicit" credibility determination regarding her testimony. Pl.'s Reply at 1; Def.'s Mem. at 14. Specifically, Plaintiff argues that the ALJ did not actually or appropriately reject her testimony that Lewis was her only sexual partner during the relevant time period and that Lewis was the father. Therefore, the ALJ's credibility determination was insufficient as a matter of law. Pl.'s Mem. at 17-18. The Commissioner, on the other hand, asserts that the ALJ found that although there was "no direct evidence of record to rebut" Plaintiff's assertion that Lewis was the father of her twin daughters, that the ALJ expressly stated that Plaintiff made statements which contradicted her own testimony and that of her father at the hearing. Def.'s Mem. at 14. The Commissioner, thus, contends that the ALJ did address Plaintiff's credibility and "implicitly" found her not fully credible. *Id.*

This court finds Plaintiff's position to be availing. In the subject circumstance, the ALJ needed to make an explicit credibility finding, and this court cannot presume that the ALJ disbelieved all of the claimant's testimony unless the ALJ explicitly states this. *See Schroeter v. Sullivan*, 977 F.2d 391, 394-95 (7th Cir. 1992). In *Schroeter*, the Seventh Circuit expressly held:

> The Secretary argues that the ALJ rejected Schroeter's hearing testimony concerning the demands of her past work because her oral description conflicted with the written disability reports she completed before the hearing. But while we must defer to an ALJ's credibility assessment of a witness (unless it is patently wrong), we must first be certain that a credibility determination has actually been made. If the ALJ disbelieved Schroeter's testimony at the hearing, he did not say so in his opinion, and

---

[5]To obtain survivors' benefits, Plaintiff must establish that Alexis and Alexandria Barnes are the natural children of Lewis as defined by the SSA. 42 U.S.C. § 402(d)(1); 416(h); *See also* 20 C.F.R. §§ 404.354, 404.355(a)(1). The parties agree that Lewis was domiciled in Illinois at the time or his death and that Illinois law applies under the above cited laws.

13

we cannot "presume that the ALJ disbelieved all of this evidence without any explicit findings to that effect." *Id.* (citations omitted.)[6]

Moreover, in *Binion*, 108 F.3d at 789, a paternity case involving survivors benefits, the court found that "[b]ecause [the ALJ] failed to address the actual credibility of [the decedent's] siblings at all, we do not give his rejection of their testimony the deference normally awarded to credibility determinations."

The court agrees with Plaintiff and finds that the ALJ failed to make the necessary explicit credibility determination regarding Plaintiff's testimony. While the ALJ may have found that several of Plaintiff's statements contradicted her testimony and that of her father's, the ALJ did not explicitly articulate his reasons for implicitly rejecting Plaintiff's testimony that Lewis was the father of her twin daughters. In fact, in his decision, the ALJ stated that there is "no direct evidence of record" to rebut Plaintiffs' assertion that she and Lewis had sexual relations, or that she did not have sexual relations with other men proximate to the time she became pregnant." (R. 32-33.) The ALJ also stated, with respect to the veracity of Plaintiff's testimony, that [t]here is no basis in this record for concluding that [Plaintiff's] belief is insincere." (R. 32.) The ALJ also concluded that Plaintiff could have become pregnant in June, 1987, while living with Lewis. Too, the ALJ concluded that Plaintiff had consistently reported to third parties that Lewis was the father of her daughters. (R. 32.) Finally, the ALJ found that it was possible that Lewis was the natural father of Alexis and Alexandria Barnes. (R. 33.)[7]

---

[6]In an appropriate circumstance, the omission of an ALJ to make a proper credibility determination is critical because the testimony of a single witness can in a proper circumstance satisfy the requisite burden of proof. *See Brown v. Bowen*, 847 F.2d 342, 345 (7th Cir. 1988).

[7]The record contains additional evidence that the ALJ may have considered or could consider, in making the requisite explicit determination of credibility as to the Plaintiff. For

14

In view of the foregoing, the court recommends that the cause be remanded for entry of an explicit credibility determination regarding Plaintiff's testimony.

## II. LEWIS'S TELEPHONE RECORDS

Plaintiff argues that the ALJ failed to subpoena the Lewis's telephone records because the ALJ found that the request for the subpoena failed to establish the minimal showing required for it to be issued and that the subpoenas would not reasonably be expected to disclose relevant evidence. Pl.'s Mem. at 14.

In this case, the ALJ relied heavily upon the lack of corroboration of Mr. Barnes's testimony concerning the telephone call he placed to Mr. Lewis regarding the circumstances surrounding Plaintiff's pregnancy. (R. 35, 446-48.) Pl.'s Mem. at 14. The ALJ found that, "[t]he purportedly corroborative telephone billing information from Mr. Barnes and his telephone company do not substantiate that he placed a single, lengthy telephone call to Mr. Lewis." (R. 35.) Pl.'s Mem. at 14. In his decision, the ALJ stated that the three one-minute telephone calls reflected in Mr. Barnes's telephone records did not support his testimony and that he was "more convinced by the direct, clear, and responsive testimony of Mr. and Mrs Lewis concerning their contacts with the Barnes family."[8]

---

instance, Plaintiff wrote a letter to her great grandmother in which she stated that she was living with Lewis, was intimately involved with him, and they were planning on getting married in the future. (R. 187-88.) Further, there is documentary evidence Plaintiff and Ron Lewis were living together at the time she became pregnant. (*See e.g.*, 65, 66.) And Plaintiff named Lewis as the father of her daughters when she applied for welfare benefits knowing that the state would contact Lewis for support, and that she would face penalties for lying and would have to cooperate with any prosecution brought by the state. (R. 396-97.) Plaintiff also named Lewis as the father of Alexis and Alexandria Barnes when she obtained Social Security cards for them. (R. 18.)

[8]In finding the Lewis's testimony credible with respect to the telephone conversations, the ALJ failed to recognize the inconsistency between the Lewis's testimony and the objective evidence as it related to Lewis's apartment. Mr. and Mrs. Lewis both testified that Lewis never

15

(R. 36); Pl.'s Mem. at 14. Therefore, the ALJ's decision to believe the Lewis's testimony was based, in large part, upon Mr. Barnes's telephone records that led the ALJ to find that he was "not convinced by this record that the wage earner made an oral acknowledgment of the claimants' paternity to his parents." *Id*; Pl.'s Mem. at 14.

The ALJ has a duty to develop a full and fair record. *Thompson v. Sullivan*, 933 F.2d 581, 587 (7th Cir. 1991). "An ALJ has this well-established duty to develop a full and fair record because the hearing is non-adversarial . . ." *Cunningham v. Apfel*, 222 F.3d 496, 501, n. 6 (8th Cir. 2000).

Mr. Barnes, for example, testified that he called Mr. Lewis to discuss Plaintiff's pregnancy and recalled having a lengthy conversation with him. (R. 447-48.) Critically, however, Mr. Barnes, did indicate that it was possible that Mr. Lewis called him back. (R. 447-48.) Furthermore, Plaintiff testified that Mr. Lewis did call her father back after he placed the initial call. (R. 399.)

A review of the Lewis's telephone records, can disclose whether Mr. Lewis placed a call (return call) to Mr. Barnes's residence; thereby, corroborating Plaintiff's and Mr. Barnes's testimony of a lengthy telephone conversation between Mr. Lewis and Mr. Barnes during which Lewis admitted that he had impregnated Plaintiff. Therefore, the record fails to support the ALJ's decision that it was not necessary to subpoena the Lewis's records.

Accordingly, the court recommends that the cause be remanded with instructions to subpoena the Lewis's telephone records during the relevant time period.

### III. MENDENHALL AFFIDAVIT

---

lived in an apartment in Prescott, Arizona. (R. 411, 413, 432.) The record, however, clearly indicates that Mr. Lewis knew about his son's apartment because he sent a rent payment to his apartment complex (Woodland's Apartments) with a note attached listing his son's apartment number. (R. 147.) The check was later returned to Mr. Lewis for insufficient funds, with a note from the apartment manager concerning this matter. (R. 176.)

Plaintiff argues that the ALJ did not articulate his reason for rejecting Ms. Mendenhall's affidavit. Pl.'s Mem. at 18. Defendant, on the other hand, asserts that Ms. Mendenhall's affidavit statements were vague, and did not provide clear and convincing evidence of paternity. Def.'s Mem. at 16.

The court agrees with Plaintiff on this issue. The ALJ rejected Ms. Mendenhall's affidavit finding that her statements were "vague and inconsistent" and therefore, unconvincing. (R. 36.) The ALJ, however, did not articulate what he found to be inconsistent in Ms. Mendenhall's affidavit, whether he found it inconsistent with other evidence in the record, and if so, which evidence he was referring to in the record.

Squarely on point is *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). In *Zurawski*, the Seventh Circuit was confronted with a similar situation noting that the ALJ found that the plaintiff's complaints were "not entirely credible due to the inconsistencies with the objective medical evidence." However, the Seventh Circuit noted that "[u]nfortunately, we are left to ponder what exactly are these 'inconsistencies' because the ALJ provided no further explanation." *Id.* The Seventh Circuit thus remanded the case, *inter alia,* for further explanation concerning the purported inconsistencies. A similar remand is warranted here.

The court, therefore, recommends that the cause be remanded to the ALJ for further explanation as to the subject, purported inconsistencies.

## IV. LEWIS'S DEATH

Plaintiff asserts that the ALJ erred by cutting off her right to cross-examine Mrs. Lewis regarding her son's death. Pl.'s Mem. at 16-17. Plaintiff asserts that she should be permitted to question Mrs. Lewis to determine if Lewis's death relates to his fathering her twin daughters. *Id.*

17

Defendant asserts that questions relating to the death of Mrs. Lewis's son are not relevant and that Plaintiff was otherwise allowed to fully cross-examine Mrs. Lewis. Def.'s Mem. at 15-16. Moreover, because Mrs. Lewis testified that Lewis never told her that he was the father of Plaintiff's twin daughters; the paternity issue, in this case, has already been addressed. *Id.*

Upon review, the court finds and recommends that the ALJ did not abuse his discretion in denying cross-examination on this issue based on relevancy.

## CONCLUSION[9]

Based on the foregoing, the court recommends that Plaintiff's motion for summary judgment be granted insofar as it requests a remand and that Defendant's cross-motion for summary judgment be denied. Accordingly, the court recommends that the cause be remanded to the Commissioner for further proceedings consistent with this opinion.[10]

ENTER: 10-4-01

*[signature]*

IAN H. LEVIN
United States Magistrate Judge

Dated: October 4, 2001

---

[9]In addition it bears noting that the court has reviewed and considered all of the points raised by Plaintiff and the Commissioner, including some that were found to be impracticable and unnecessary to be addressed herein.

[10]The court recommends that the Plaintiff's request for a court order that the cause be reassigned to a new ALJ be denied, no basis having been given or being perceived for such request.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the Magistrate Judge's Report and Recommendation. *See* Fed.R.Civ.72(b); 28 U.S.C. § 636(b)(1)(B); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 329 (7th Cir. 1995); *The Provident Bank v. Manor Stell Corp.*, 882 F.2d 258 (7th Cir. 1989).

**Copies Have Been Delivered
In Open Court or Mailed To:**

| | |
|---|---|
| Barry Alan Schultz<br>Law Offices of Barry A. Schultz, P.C.<br>1609 Sherman, Suite 207<br>Evanston, IL 60201<br>(847) 864-0224<br>*Attorney for Plaintiff* | Jonathan C. Haile, AUSA<br>United States Attorney's Office<br>219 S. Dearborn St., Suite 500<br>Chicago, IL 60604<br>(312) 886-4073<br>*Attorney for Defendant* |